## BELINDA COELHO *v.* ADAM FERNANDEZ.

### No. 4218.

JUNE 19, 1963.

TSUKIYAMA, C.J., CASSIDY, WIRTZ, LEWIS AND MIZUHA, JJ.

OPINION OF THE COURT BY LEWIS, J.

Plaintiff-appellant, alleging her ownership of a lot together with a dwelling house thereon occupied by defendant-appellee, brought this action to oust defendant, to obtain a determination against defendant's adverse claim, and to recover the reasonable value of use and occupancy from and after December 1, 1959 pursuant to a notice to vacate given October 27, 1959, which required that defendant vacate on or before November 30, 1959.

The property involved is situate at Wailuku, County

of Maui, and the suit was brought in that county.

It is undisputed that the lot was deeded on November 4, 1948 to plaintiff and her husband, Joseph Coelho, as joint tenants, pursuant to an agreement of sale dated March 11, 1947. According to the evidence plaintiff's husband joined with her in giving the notice to vacate on October 27, 1959. He died November 14, 1959 before the action was brought. Plaintiff asserts title as the surviving joint tenant.

In defendant's answer he denied plaintiff's title and as an affirmative defense set up equitable estoppel. He alleged that in January, 1953 and prior thereto the deceased, Joseph Coelho, "with the knowledge and acquiescence of the plaintiff," invited defendant and his wife to build their home upon the land and promised to convey "the said land" to defendant and his wife; that so induced, defendant caused the erection of a dwelling house and certain other improvements, and with his family took up residence on the land in August, 1953.

Defendant is the son-in-law of plaintiff. He married Katherine Fernandez, the daughter of plaintiff and Joseph Coelho, on June 20, 1931. Defendant and his wife have six living children of whom three are minors. Two sons and a married daughter were living with defendant on the property at the time of the trial.

Katherine Fernandez testified that she had not lived in the house since October 25, 1959. At the time of the trial she had a divorce action pending. She disclaimed any interest in the property, testifying that her father "was trying to help us out, we don't have to pay rent," and that they were to live in the house until her parents needed it. She was not a party to the action.

The trial court held that the case was governed by *Motonaga* v. *Ishimaru*, 38 Haw. 158, and found in favor of defendant "that Mr. Coelho promised that defendant and

his wife were to have this land; that in reliance on such promise the defendant expended much work and labor and some sums of money in clearing the land, building a home and making improvements thereto, that it would be inequitable now to allow plaintiff to eject him from these premises." After finding that a one-half interest in the land was "subject to the right or interest of the defendant and his wife," the court further found that there was "not sufficient evidence to establish any estoppel against the interest in said land which the plaintiff has in her own right," but that she "has no interest in such house and improvements."[1]

There was evidence of the rental value of the premises as improved, but no evidence of the rental value of the land itself and plaintiff declined to offer any. The omission from the judgment of any award for use and occupancy thus is explained. Nevertheless the form of judgment clearly was erroneous, apart from the correctness of the underlying findings and conclusions. The judgment dismissed the complaint and failed to set out the extent of the respective interests. Defendant's answer had denied plaintiff's title, and plaintiff was entitled to judgment to the extent of the title proved by her even if the action be viewed purely as an ejectment action. *Moranho* v. *De Aguiar*, 25 Haw. 271, 272, and cases there cited; *Medeiros* v. *Koloa Sugar Co.*, 29 Haw. 43, 46; *Fong Hing* v. *Yamaoka*, 31 Haw. 436, 442. Moreover, plaintiff's second count specifically sought a determination of the title, while the first count sought ouster of defendant and recovery for use and occupancy.

In defense of the judgment defendant contends that plaintiff is estopped to assert any interest in the property, even the one-half interest in the land as to which the

---

[1] Plaintiff asserts that the court could not award the whole of the improvements to defendant and his wife but at most one-half. As will be seen, we find it unnecessary to pass on the point at this time.

court below ruled in her favor. There was no cross-appeal by defendant, but we will consider the point since defendant was not aggrieved by the judgment and could not appeal. It is an instance of appellee seeking to uphold a judgment on grounds other than those of the trial court. See *Inter-Island Resorts* v. *Akahane,* 44 Haw. 93, 352 P.2d 856, 46 Haw. 140, 377 P.2d 715; but see *Ulrich* v. *Hite,* 35 Haw. 158, 188.

As seen, the trial judge found that "there is not sufficient evidence to establish any estoppel against the interest in said land which the plaintiff has in her own right." This finding is supported by the record. Defendant's argument is based principally on one statement by plaintiff on the stand that "the house was given to them, both of them if they agreed to stay together." At other points she made it clear that she was talking about occupancy until the place was needed by the owners, not conveyance of title. Though defendant testified he told plaintiff that Mr. Coelho was giving the property to him and his wife, and plaintiff told him "that is nice," plaintiff denied this and in an earlier suit in the district magistrate's court defendant himself testified plaintiff made no promise at all.

As to defendant's further contention that plaintiff is estopped because she knew of the improvements and did not assert her title, none of the cases cited is applicable. Plaintiff's interest in the property was of record. *Cf., De Freitas* v. *Coke,* 46 Haw. 425, 380 P.2d 762. Plaintiff, as a cotenant with her husband, had no duty to speak out against the improvements, which beyond question were authorized by her husband and were not the work of one who in her eyes was a trespasser. Whether plaintiff takes her half of the improvements without any duty of contribution is a different matter, which on the view we take of the case does not concern us at this time. See 14 Am.

Jur., *Cotenancy*, § 49; 48 C.J.S., *Joint Tenancy*, § 8.

Plaintiff, while objecting to the form of the judgment, further contends, *first*, that there was no severance of the joint tenancy during the lifetime of Joseph Coelho and defendant is in the same position as a judgment creditor of a deceased joint tenant who has taken no steps under the judgment before his death; *second*, that in any event defendant did not meet the burden of establishing his equitable right with the requisite "clear, definite and unequivocal evidence," citing *Poka* v. *Holi*, 44 Haw. 464, 472, 357 P.2d 100.

As to this last contention, defendant counters with the proposition that *Poka* was a specific performance suit. Conceding that defendant has the burden of proof under his affirmative defense of equitable estoppel, he nevertheless contends that such burden may be met by a mere preponderance of the evidence. He further contends there was a severance of the joint tenancy.

We hold that defendant's burden of proof was the same as it would have been in a specific performance action brought by him. Defendant's affirmative defense of equitable estoppel in reality is an assertion of a right to specific performance. In point are *Kidwell* v. *Godfrey*, 14 Haw. 138, and *Kamohai* v. *Kahele*, 3 Haw. 530, holding that an equitable estoppel does not pass the legal title, and *Molokai Ranch, Ltd.* v. *Morris*, 36 Haw. 219, 226, holding that to make out an equitable estoppel on the basis of oral promises and performance in reliance thereon "a contract must be found to exist with all the requisites of an enforceable contract in equity had it been in writing." Plaintiff is correct in her contention that *Poka* v. *Holi* applies.

On the question of severance, *Manias* v. *Yeck*, 11 Ill. 2d 512, 144 N.E.2d 596, is in point. While the present case does not involve a contract upon an agreed consider-

ation, *Manias* cannot be distinguished on that ground or by reason of the action there having been commenced while both joint tenants were living. See *Klouda* v. *Pechousek,* 414 Ill. 75, 110 N.E.2d 258, and *Naiburg* v. *Hendriksen,* 370 Ill. 502, 19 N.E.2d 348. If in the present case a right to specific performance arose on the basis of a definite and final promise of Joseph Coelho which became binding and was taken out of the Statute of Frauds by reason of possession taken and improvements made in justifiable reliance thereon and in conformity with the conditions, if any, laid down by the promisor, then when this equitable interest ripened it effected a severance in equity. *Cf., Kozacik* v. *Kozacik,* 157 Fla. 597, 26 So. 2d 659. Therefore the question at issue is whether defendant established by clear, definite and unequivocal evidence that a right to specific performance existed in the lifetime of Joseph Coelho.

*Kurowski* v. *Retail Hardware Mut. Fire Ins. Co.,* 203 Wis. 644, 234 N.W. 900, has been cited as authority negativing the possibility of a severance. *Kurowski* recognized that a severance may be effected in equity, but held there was none when the whole property had been contracted to be transferred but only one joint tenant so promised. We prefer the reasoning of *Tracy-Collins Trust Co.* v. *Goeltz,* 5 Utah 2d 350, 301 P.2d 1086 and decline to follow *Kurowski.* The question then is the existence of the right to specific performance.

Defendant, an employee for thirty-eight years of Hawaiian Commercial & Sugar Co., presently a machinist journeyman, before moving to the property in controversy was renting a company house at Spreckelsville for $23.80 a month. At that time the lot here involved was unimproved. According to the defendant, Joseph Coelho "promised the land be given to me and my wife and children * * * and he will help me on the finances on the

house, I mean material." At other times he testified the land was to be "turn[ed] in * * * to me and my wife." Defendant's brother John testified that Mr. Coelho said "this home will be for him [defendant] and his wife * * *." A son, Patrick, testified that his grandfather had told him, when he was at the age of ten years, seven years before the trial, "that the house was going to belong to my mother and father" but immediately thereafter he testified: "Q. Your father and who? A. And my mother and everybody."

An old house was bought and moved to the property. Asked about "a discussion with Mr. Coelho about finances, the building of the house," defendant testified:

"A. Yes, I told him that he finance, I mean he give me land so I told him that I bought the home from H.C.&S.[2] and that he furnished the check. I borrowed the money, borrowed $2,000.00 from my brother and I gave Mr. Coelho and he signed the check to K.D.[3] in order my name and I give that check to H.C.& S."

He further testified:

"A. Yes, he told me that he has an open account at Maui Dry Goods and that I go and buy what I want then I will pay him as I go along.

"Q. What about cost of labor in building the house?

"A. That was the same thing then he furnish the checks to the labor and all that and I pay him the same as the home.

"Q. By that you mean he would pay for the labor and you would reimburse him, is that correct?

"A. Yes."

It was on January 9, 1953, he testified, that he paid over to Mr. Coelho $2,000 previously borrowed from his

---

[2] H. C. & S.—Hawaiian Commercial & Sugar Co.

[3] K.D.—Kahului Development Co., a subsidiary of H. C. & S.

brother John, receiving from Mr. Coelho a check which he took to H.C.& S. On that day H.C.& S. issued its receipt to defendant in the amount of $900 credited to his account. The payment was in the form of a check in that amount drawn by Joseph Coelho to cash. According to a duplicate receipt issued to defendant by H.C.& S. the payment was "For sale of House #1730."

Defendant testified: "The payment was made on the place I am living now" and he was "living there at the time." He amended that to "working on the place" "painting the garage." According to him, the house was moved on to the property before January 9, 1953 when it was paid for.

Prior to paying this $2,000 to Mr. Coelho on January 9, 1953 defendant had had it buried in the garage at the Spreckelsville place, he testified. But at another point he testified he dug it up in August, 1953 when the family moved, which of course was long after the alleged date of payment.

The house was moved on to the lot by men paid by Mr. Coelho. Thereafter the house was remodeled, and a garage and wash house built, again by men paid by Mr. Coelho. Defendant testified that he and his brothers helped and that they did all the painting though Mr. Coelho "financed the paint," for which Mr. Coelho paid $150. Defendant himself, he testified, had cleared the land in preparation for the improvements before the house was moved there. Computations by defendant as to the time he and his brothers put in were in the neighborhood of 1500 to 2000 hours, depending upon the interpretation of his testimony.

As to repairs and maintenance defendant again testified "Mr. Coelho financed that and I paid Mr. Coelho." In 1959 a wall was built along one boundary, for part of the cost of which Mr. Coelho paid the neighbor $150 and,

according to defendant, he paid this to Mr. Coelho.

Mr. Coelho, defendant testified, paid the taxes along with those on "ten to fourteen homes he have" and "at the same time he comes to my place and I give him money to pay on our home." He further testified:

"* * * The last time June 20th when I received paper. I don't know how that came tax office but I could see it now, came through Katherine Fernandez, 286 Waihee Beach Road."

A witness called by defendant, a car salesman whom Mr. Coelho had taken to the property in 1959 to appraise Mrs. Fernandez' car, testified:

"A. Yes, I recall his telling me that the house was his house too before but he gave it to the daughter. I gave it to my daughter he said.

*       *       *       *

"Q. Now remember he used—didn't he say I gave it to them?

"A. No, he said I gave it to my daughter, he said."

It is noteworthy that, about three years before the trial, that is, around 1957, Joseph Coelho had given Katherine Fernandez two houses at Happy Valley. The trial judge found that Katherine was Mr. Coelho's favorite daughter, that he had given her these two houses and an automobile, and that he was particularly fond of her children. But we have no question before us as to ownership of the property in question by Katherine Fernandez as sole owner.

There had been a previous suit in the district magistrate's court for summary possession which evidently was not decided for the reason that the defense put the title in dispute and the case thus went beyond the magistrate's jurisdiction.[4] In the previous suit defendant testified that he had put in "about $1,500" in cash, plus $500 paid to

_____
[4] *Yanagi* v. *Oka,* 24 Haw. 176.

Mr. Coelho when the house was bought, part of a credit union loan of $990. In this case he testified that in addition to the $2,000 payment in 1953 he made three $500 payments to Mr. Coelho, the first in 1955, and the second and third in 1959 shortly before Mr. Coelho died. He testified that he made these payments as well as putting in work and labor because "he promise me the property," "he say the land be mine." On the occasion of the last $500 payment to Mr. Coelho, he testified, Mr. Coelho said "you don't have to pay no more what you paid me." There was much confusion about dates in his testimony.

The money paid in 1955 he had saved and put into bonds, then cashed the bonds and kept the money in the house, he testified. He said the money he paid in 1959 was part of a $1,300 loan made at the Wailuku office of Finance Factors. As to the credit union loan, he testified in this trial that it was used to buy furniture except for about $300 which he used for the house. (The amount left over after paying for the furniture later was shown to be $224.35.)

It was established that the only bank account maintained by Joseph Coelho showed no deposit of $2,000 or even $500 during the period up to March 21, 1955.

Defendant had a fourth grade education. His take-home pay was $50-$60 a week. Besides working for H.C.& S. he did part-time work paying him $15 to $20 per month. He testified that on this income he was able to pay his brother John back, starting in 1953, and except for the Credit Union loan had only small bills, and was able to save. His wife, on the other hand, testified her husband "did not have no money." "We always was in debt."

Defendant's brother John took the stand and supported him as to the $2,000 loan and its repayment.

The trial judge at the conclusion of argument rendered

an oral decision in which he said:

"* * * the evidence is undisputed that Fernandez did do quite a bit of work down there and has lived there all the time and has remained in possession for over a period of six years. During that time he has evidently made improvements. I agree with counsel that these transactions are considerably cloudy, and if I had to decide this purely on the question of whether or not these payments were made or how they were made or what became of the money if they were made, I would be very much confused. But I don't believe the case turns upon that question entirely."

After the pronouncement of this oral decision counsel for plaintiff asked the court to "make a finding as to who paid for the house," arguing that "the testimony is undisputed that it was paid for by Mr. Coelho except for the labor of Mr. Fernandez." The record then shows the following:

"THE COURT: The evidence only shows that Mr. Fernandez asked Mr. Coelho to help him with financing; it doesn't show that Mr. Fernandez—it doesn't show any agreement or understanding between them that the money that Mr. Coelho may have advanced was to be repaid. I don't recall one single bit of evidence that there was any agreement that it was to be repaid. That is why I have stated that I don't consider the question which has been raised here as to the payments too vital because this was, as I take it, was an intention to give the land."

In the written decision the court set out *inter alia* that:

"In support of defendant's claim of equitable estoppel, evidence was introduced showing:

\*          \*          \*          \*

that Mr. Coelho promised to give this piece of land to defendant and his wife, Katherine C. Fernandez,

(daughter of Mr. Coelho and plaintiff) and also to help him with financing;

\*     \*     \*     \*

that his father-in-law had assisted him financially and that he, defendant, had repaid him $3,500.00 from time to time.

\*     \*     \*     \*

"\* \* \* Evidence was also adduced tending to rebut the claim that defendant had made any financial reimbursement to his father-in-law.

"The questions of fact raised by the testimony are:

1. What promise, arrangement or agreement did Mr. Coelho make in regards to defendant's occupancy of this land.

2. Did the defendant reimburse Mr. Coelho for cash advanced to build the house.

\*     \*     \*     \*

"Whether the defendant repaid any moneys to Mr. Coelho or how much he repaid, while material, is not essential for it does not appear that the payment or repayment of moneys was a condition of the agreement under which Fernandez was given an interest in this land."

We do not agree with the court's conclusion that the matter of repayment to Mr. Coelho of the money expended by him "is not essential." Defendant at no time claimed a gift of the improvements. Though the court in the oral decision said that the arrangement that Mr. Coelho would "finance" the improvements did not necessarily import repayment, that view is not supported by the pleadings or testimony. The gift was of the land—that was the claim.

According to defendant, Mr. Coelho put $3,650 into the improvements. As the trial court itself recognized in the oral decision, the arrangement between the parties as

to the repayment of this sum, or whatever amount Mr. Coelho did expend—undoubtedly a very substantial part of the value of the improvements—is a mass of confusion. There is no clear, definite and unequivocal evidence that defendant was to be given an interest in the land whether he paid for the improvements or not. To the contrary, defendant's own evidence was that he was to pay. In stating that "it does not appear that the payment or repayment of moneys was a condition of the agreement under which Fernandez was given an interest in this land" the trial court placed the burden of proof on the wrong party. Moreover, the trial court failed to recognize the governing rule as to the quantum of proof.

Defendant makes the point that a finding of a parol gift "is justified and sustainable under the clear and convincing evidence rule even though the testimony be in sharp conflict," citing *Jones* v. *Jones,* 250 F.2d 454 (9th Cir.) ; *Davenport* v. *Board of Education of City of Drumright,* 204 Okla. 356, 230 P.2d 271; *Bentz* v. *Esterling,* 76 S.D. 331, 78 N.W.2d 73. But those were not cases in which the alleged promisee's own case was so confusing and unreasonable as to fail to carry conviction to the mind of the reviewing court. We had such a case in *Poka* v. *Holi, supra,* where the gift allegedly was made on the condition that the promisee pay off the mortgage, yet under the promisee's claim that the property was to be conveyed to him when this was done he alone would benefit by the performance of the condition. Differing from this case, the evidence in *Poka* showed that the alleged donor was an improvident sister who went to her brother for help in saving the property from foreclosure. Here we have the more usual case of a father who seeks to help his daughter and her husband. But the relation between the parties cannot supply the lack of clarity in an essential element of the case—the arrangements as to

the large cash expenditures made by the father.

As appears from the court's written decision, the basis thereof was that Mr. Coelho knew defendant was hard pressed financially and he was not the kind of man, the court thought, who would take an inequitable advantage of his son-in-law by throwing him off the place after the amount of work he had put into the improvements. This line of reasoning was inconsistent with what the court had to say about the notice to vacate—that "it might indicate the frame of mind, intention or feelings of Mr. Coelho as of its date" but could not be given much weight in determining what the understanding was at the outset, particularly upon consideration of deceased's manner of dealing with Fernandez and his family through the years up to the time of the notice to vacate. Here we come full circle back to the question: What were the arrangements between the parties?

The next point that presents itself is whether a new trial should be ordered. See *In re Nelson,* 26 Haw. 809, 822; *Mid-Pacific Dress Mfg. Co.* v. *Cadinha,* 33 Haw. 456, 482; *Tugaeff* v. *Tugaeff,* 42 Haw. 455, 473. In *Poka* we concluded not to order a new trial; there was the additional element of laches. However, we declined to dismiss the case and did not foreclose other relief if any were available under the general prayer of the complaint. See *Rose* v. *Parker,* 4 Haw. 593, 594.

In the present case, the trial judge has expressed himself upon the confusing state of the record and it is evident he could not make a finding in defendant's favor under the governing requirement of "clear, definite and unequivocal evidence." For the same reason, a complete new trial is not justified. That would not clear away the confusion which precludes establishment by defendant of a right to specific performance.

However, this does not necessarily mean that defend-

ant is without remedy. There is a question of unjust enrichment. See 1 Corbin, *Contracts,* § 205 at 667-68; 49 Am. Jur., *Statute of Frauds,* § 566; *id., Specific Performance,* § 175; *King* v. *Thompson,* 34 U.S. 204; *Wood* v. *Dillingham,* 5 Haw. 634, 644, 7 Haw. 93. To avoid unjust enrichment an equitable lien may be established in a proper case, based on the amount by which defendant contributed to the value of the premises. See *King* v. *Thompson, supra.*

According to defendant's witness Donald Tokunaga the improvements when completed in 1954 had a value of $4,852, to which must be added the wall later constructed, a total of $5,002; the land was valued by this witness at $1,352.[5] On defendant's evidence that Mr. Coelho expended $3,650, the labor of defendant and his brothers was worth $1,352. Half of this, representing defendant's claim as distinguished from his wife's, is $676. However, defendant and his wife for more than six years enjoyed rent-free occupancy. If this were taken into account, then on the present record no unjust enrichment would appear. But the amount Mr. Coelho expended may have been more or less than $3,650; there is a further question for disposition in the court below as to whether the rent-free occupancy should be taken into consideration and if so the value thereof; and there is the matter of repayment by defendant.

In short, the proof raises the possibility of an equitable lien but is insufficient to establish one. We have concluded that defendant should be given an opportunity to establish an equitable lien. Being contractual in nature it is, if established, in the nature of a mortgage and thus survives the death of Mr. Coelho, as distinguished from a judgment lien which would not survive. See *Goff* v.

---

[5] As of the time of the trial the improvements were valued by this witness at $5,100 and the land at $1,622.

*Yauman,* 237 Wis. 643, 298 N.W. 179; *Wilkins* v. *Young,* 144 Ind. 1, 41 N.E. 68; but see *Gau* v. *Hyland,* 230 Minn. 235, 41 N.W.2d 444; *People* v. *Nogarr,* 164 Cal. App. 2d 591, 330 P.2d 858. It is true that it is generally stated the survival of the lien is coupled with the principle that, when the lien attached, the joint tenancy terminated. *In re Feiereisen's Estate,* 263 Wis. 53, 56 N.W.2d 513; Annot., 64 A.L.R.2d 918, 934. *Wilkens* v. *Young, supra,* holding to the contrary, has been criticized. *People* v. *Nogarr, supra.* However, we are concerned here only with the rights of plaintiff as against defendant. We need not decide whether the existence of a mere lien, incurred for improvement of the premises for the mutual benefit of the joint tenants, would work a severance. In any event, the lien would survive.

Reversed and remanded for the entry of judgment for plaintiff on the first count for possession of the property and for the value of the use and occupancy since December 1, 1959.[6] On the second count, judgment is to be entered for plaintiff subject to such equitable lien as may be established by defendant on the remand of this case. The trial court shall fix a reasonable period within which defendant may amend and claim such lien. If the claim is not promptly brought on for trial, judgment is to be entered for plaintiff on the second count free from such lien. Costs to be awarded by the trial court upon the conclusion of the entire case.

*Frank D. Padgett (Enos Vincent* and *Burnham H. Greeley* with him on the brief, *Robertson, Castle & Anthony* of counsel) for plaintiff-appellant.

*Thomas S. Ogata (Ogata & Ueoka* of counsel) for defendant-appellee.

---

[6] It will be necessary for plaintiff to adduce evidence of the value of the use and occupancy, since the evidence was in conflict on that point, there was no finding, and the trial judge has retired. *Cf.,* H.R.C.P., Rule 63; 7 Moore, *Federal Practice,* § 63.04 (2d ed.).